SEND

ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT
MAY 3 1 2002
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

Laurel L. Simes (State Bar No. 134637)
LAW OFFICES OF LAUREL L. SIMES
473 Jackson St. - 3rd Floor
San Francisco, California 94111
Telephone: (415) 399-1992
Facsimile: (415) 399-1161

John R. Fabry (Texas State Bar No. 06768480)
Robert E. Shuttlesworth (Texas State Bar No. 24033184)
WILLIAMS BAILEY LAW FIRM, L.L.P.
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
Telephone: (713) 230-2200
Facsimile: (713) 643-6226

ATTORNEYS FOR PLAINTIFFS

**UNITED STATES DISTRICT COURT FOR THE**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **PRISCILLA STEWART, JEFFERY DALE STEWART, GEORGE O'DELL STEWART, JOHN LEE STEWART, ROSE MARY PIATT, PAULA DEAN QUEEN, JIMMY EUGENE STEWART, and JAMES WILLIAM STEWART, Individually and as Successors in Interest to the Estate of Paul Stewart; JAMES HOWELL; JOHN HAILEY; MIGUEL GUERRERO; and GILBERT CORNEJO,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**MINE SAFETY APPLIANCE COMPANY, a Delaware Corporation, NORTON COMPANY, a Massachusetts Corporation, and Does 1-100, inclusive,**<br><br>**Defendants.** | **Case No. CV-01-07635 DT (Mcx)**<br><br>**Consolidated With:**<br><br>**Case No. CV-01-07638**<br>**Case No. CV-01-07639**<br>**Case No. CV-01-07640**<br>**Case No. CV-01-07641**<br>**Case No. CV-01-07642**<br>**Case No. CV-01-07645**<br>**Case No. CV-01-07647**<br><br>CORRECTED<br>**THIRD AMENDED COMPLAINT FOR PRODUCTS LIABILITY; NEGLIGENCE; BREACH OF IMPLIED AND EXPRESS WARRANTY; MISREPRESENTATION AND FRAUD; WRONGFUL DEATH; AND PUNITIVE DAMAGES** |

**AND CONSOLIDATED CASES.**

ENTER ON ICMS
JUN - 3 2002

83

I.

## FIRST CAUSE OF ACTION

**(Strict Products Liability and Failure to Warn)**

1. Plaintiffs James Howell, John Hailey, Miguel Guerrero and Gilbert Cornejo are competent adults who at all times herein mentioned were residents of Santa Barbara County.

2. Plaintiffs Priscilla Stewart, Jeffery Dale Stewart, George O'Dell Stewart, John Lee Stewart, Rose Mary Piatt, Paula Dean Queen, Jimmy Eugene Stewart, and James William Stewart, Individually and as Successors in Interest to the Estate of Paul Stewart, are competent adults. Priscilla Stewart is the surviving spouse of Paul Stewart. Jeffery Dale Stewart, George O'Dell Stewart, John Lee Stewart, Rose Mary Piatt, Paula Dean Queen, Jimmy Eugene Stewart and James William Stewart are the natural-born children of Paul Stewart and Priscilla Stewart. Prior to his death, Paul Stewart was a resident of Santa Barbara County.

3. Plaintiffs do not know the true names and capacities, whether corporate, associate or individual, of Defendants sued herein as Does 1-100, inclusive, and each of them, and for that reason pray for leave to insert the true names and capacities of said Defendants when the same are ascertained. Plaintiffs are informed and believe and therefore allege that each of the Defendants designated herein as a Doe is strictly liable, negligent, intentionally responsible or in some manner responsible for the events and happenings herein referred to, and legally caused injuries and damages to Plaintiffs thereby as hereinafter alleged.

4. At all times herein mentioned, each of the Defendants was the agent and employee of each of the remaining Defendants, and was at all times acting within the purpose and scope of said agency and employment and each Defendant has ratified and approved the acts of the remaining Defendants.

5. Plaintiffs are informed and believe and therefore allege that at all times herein mentioned that the named Defendants and Does 1-100, exclusive, were the agents, employees, partners, franchisers, corporate parent companies, subsidiaries and/or joint venturers of the named Defendants and Does 1-100, and in doing the things hereinafter set forth were at all times acting within the course, scope and authority of such agency, employment, partnership, franchise, business relationship, and/or joint venture, and that all acts, omissions, and conduct of each named Defendant and Does 1-100 was ratified and adopted by each named Defendant and by Does 1-100.

6. At all pertinent times, Defendant MINE SAFETY APPLIANCE COMPANY was and is a Delaware Corporation with its principal place of business in Minnesota, authorized to do business and doing business in the State of California.

7. At all pertinent times, Defendant NORTON COMPANY was and is a foreign corporation, organized and existing under the laws of the State of Massachusetts authorized to do business and doing business in the State of California. Plaintiffs Priscilla Stewart, Jeffery Dale Stewart, George O'Dell Stewart, John Lee Stewart, Rose Mary Piatt, Paula Dean Queen, Jimmy Eugene Stewart, and James William Stewart, Individually and as Successors in Interest to the Estate of Paul Stewart; James Howell, Miguel Guerrero, and Gilbert Cornejo are not asserting the claims herein against Defendant Norton Company.

8. From approximately 1950 to 1998, James Howell, John Hailey, Miguel Guerrero, Gilbert Cornejo and Paul Stewart (collectively referred to herein as "Worker Plaintiffs") were employed at the Celite (formerly Johns Manville) and/or Grefco plant in Lompoc, California. During this period, Worker Plaintiffs were exposed to silica dust, asbestos dust, diatomaceous earth and other fibrogenic dusts during the ordinary course of their duties at the plant.

9. During their employment, Worker Plaintiffs were provided defective respiratory protective equipment designed, manufactured, supplied, distributed and/or sold by Defendants. The purpose of the protective respiratory equipment designed, manufactured, supplied, distributed and/or sold by Defendants was to protect Worker Plaintiffs from breathing excessive levels of toxic fibrogenic dusts. During operations in the plant, silica, asbestos and other fibrogenic dust is created, including particles that are invisible to the human eye and which are unknowingly inhaled by workers during plant operations. These invisible fibrogenic dust particles circulate throughout the plant because they are suspended in the air and travel considerable distances, thereby exposing workers throughout the plant.

10. The defective protective respiratory equipment designed, manufactured, distributed, supplied and/or sold by Defendants failed to adequately protect Worker Plaintiffs from breathing excessive levels of toxic and fibrogenic dusts. The defective respiratory equipment failed to perform as safely as an ordinary consumer and user of the equipment would expect and failed to adequately warn the consumer and user of the product of the dangers inherent in its use.

11. The dangers of exposure to silica, asbestos and other fibrogenic dust have been reported in medical literature for over seventy years. Medical articles published in the world's

medical literature and in the literature within the United States have clearly established that exposure to silica and asbestos dust causes fatal disabling and terminal diseases, including silicosis, asbestosis and cancer.

12. In the early 1930's, the disease silicosis received widespread publicity when hundreds of workers died and in excess of one thousand workers contracted silicosis in the construction of a tunnel in West Virginia. This silica-containing dust caused numerous disabling diseases and conditions, including silicosis, pulmonary disease, pulmonary tuberculosis, rheumatoid and other collagen disease, pulmonary fibrosis and cancer. The dangers of asbestos have been known from the early part of the last century. The dangers of asbestos included asbestosis, pleural disease, lung cancer, mesothelioma and gastrointestinal cancer.

13. To prevent its employees from being stricken with one of these life-threatening diseases, Worker Plaintiffs' employer provided respiratory safety and protection equipment for Worker Plaintiffs' use. Worker Plaintiffs' employer and Worker Plaintiffs relied upon Defendants in purchasing and using this respiratory safety and protective equipment. Defendants designed, manufactured, distributed, supplied and sold these respirators and masks, which were wholly inadequate in protecting Worker Plaintiffs from inhaling excessive amounts of these deadly dusts. The respirators and masks, designed, manufactured, distributed, supplied and sold by Defendants, did not protect Worker Plaintiffs from the dangerous silica and asbestos and exposed Worker Plaintiffs to unnecessary and dangerous amounts of these deadly dusts. These products failed to meet the ordinary consumer/users' expectation of safety and were sold without adequate warnings and instructions with respect to protection from these dangerous exposures.

14. Accordingly, as a result of Defendants' defectively designed, manufactured and marketed respiratory and safety equipment and as a result of their failure to provide adequate warnings and instructions, Worker Plaintiffs breathed in contaminated air which contained dangerous and deadly levels of free silica, asbestos and other fibrogenic dusts while working in the plant.

15. As a consequence of using this defective and inadequate respiratory protective equipment and breathing dangerous levels of silica, asbestos and other fibrogenic dusts, Plaintiffs have suffered serious personal injuries and death. Defendants' defective respiratory protective equipment, respirators and masks were and are a legal cause of the serious injuries and death suffered by Plaintiffs.

16. Worker Plaintiffs first discovered that they were suffering from serious pulmonary disease and conditions legally caused by the defects in Defendants' products within one year of filing this lawsuit.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

**II.**

**SECOND CAUSE OF ACTION**

**(Negligence)**

17. Plaintiffs incorporate by reference as though fully set forth herein all of the allegations contained in Cause of Action I.

18. Defendants failed to exercise reasonable care in the design, manufacture, distribution, supply and/or sale of the respiratory protective and safety equipment. Defendants failed to adequately warn and instruct users of its products as to the dangers of proper use of the product and

failed to adequately test and provide or recommend substitute protection or safety procedures. Defendants failed to provide users with the requisite information, safety procedures, equipment and apparel as to how to use Defendants' safety equipment properly. Defendants negligently packaged and sold their products knowing they would be used in a manner which would result in the inhalation of deadly silica, asbestos and other fibrogenic dusts. Defendants failed to give adequate warnings and instructions as to the proper handling and use of their products by users who were unaware of the dangers involved in using the respirators. Defendants failed to instruct as to and provide reasonably safe procedures and a reasonable safety plan with respect to the use of Defendants' respiratory equipment. Defendants failed to test, and tested inadequately, to determine the risks of its products and failed to review the available literature and determine the dangers inherent in the products' use and failed to instruct Worker Plaintiffs as to the risks, dangers and methods of safe use. Defendants failed to adequately instruct concerning the safe maintenance and storage of the respiratory equipment in order to prevent harm to Worker Plaintiffs.

19. Defendants knew and, with the exercise of reasonable care, should have known that their safety products and equipment were defective and not adequate for the intended use of the equipment. Defendants failed to timely remove their products from the market upon ascertaining that the products could cause disease, disability and death. Defendants failed to investigate and test their products to determine how the products were being used and to determine that the products could not be used safely in operations where silica, asbestos and other fibrogenic dusts were being breathed. Defendants failed to develop procedures and methods whereby their respiratory equipment could be safely used in a manner which would prevent the inhalation of dangerous dusts.

20. As a consequence of Defendants' negligence as described above, Plaintiffs have suffered serious personal injuries, including death, and Defendants' negligence was and is a legal cause of Plaintiffs' injuries.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

**III.**

**THIRD CAUSE OF ACTION**

**(Breach of Implied Warranty)**

21. Plaintiffs incorporate by reference as though fully set forth herein all of the allegations contained in Causes of Action I-II.

22. Defendants breached implied warranties that their respiratory protective and safety equipment was adequate for the intended purpose of protecting Worker Plaintiffs from breathing excessive quantities of fibrogenic dusts, including silica, asbestos and diatomaceous earth.

23. Defendants' breach of implied warranties was the legal cause of Plaintiffs' serious injuries and death.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

**IV.**

**FOURTH CAUSE OF ACTION**

**(Breach of Express Warranty)**

24. Plaintiffs incorporate by reference as though fully set forth herein all of the allegations contained in Causes of Action I-III.

25. Defendants breached the express warranties set forth in detail in the Fifth Cause of Action to the effect that those Defendants stated their respiratory protective and safety equipment

was adequate for the intended purpose of protecting Worker Plaintiffs from breathing excessive quantities of fibrogenic dust, including silica, asbestos and diatomaceous earth.

26. Defendants' breach of express warranties was the legal cause of Plaintiffs' serious injuries and death.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

**V.**

**FIFTH CAUSE OF ACTION**

**(Misrepresentation and Fraud)**

27. Plaintiffs incorporate by reference as though fully set forth herein all of the allegations contained in Causes of Action I-IV. In addition to these allegations, Plaintiffs also allege as against Defendants Norton Corporation and Mine Safety Appliance as follows:

28. In 1971 Norton Company purchased the assets of Welsh, a division of Textron, and continued manufacturing and selling the Welsh 7100 and 7100V respirators. In connection with the purchase of the assets of Welsh, and its respiratory line of products, Norton Company also acquired the internal documents of Welsh, its testing data, its product information, its sales and marketing data, documents and memoranda demonstrating the deficiencies of the respirator line, its filters and valves, and also continued to employ many of the senior management employees who had been involved in the design, manufacture, testing and marketing of the respirator line. In connection with the sale and distribution of these respirators, Norton Company made certain statements and representations which were in fact false and which Norton Company knew were false. These false statements and false representations are set forth as follows:

29. An April 1977 product brochure under the logo Norton Safety Products entitled Norton Reusable Dust Respirator Model 7100V states that the respirator provides "protection against toxic dusts and mists." Beneath a picture of a worker wearing the mask, the brochure specifically states that the mask is "for asbestos and other pneumoconiosis-producing dusts."

30. The carton and packaging for the Norton 7100 and 7100V states that it is "one respirator" for all "dusts and mists" and calls itself the Air-Aider respirator. Artwork for the package in February 26, 1976 describes the Norton 7100 as "for respiratory protection against dusts and mists."

31. Another product brochure found in Norton files distributed to customers by Welsh describes the list of contaminants that the Norton 7100 protects against, and this list includes silica, asbestos and pneumoconiosis dusts. It describes the respirator as providing protection against dusts and mists having a Threshold Limit Value (TLV) of not less than .1 milligrams per cubic foot or 2.4 million particles per cubic foot. The product literature states that the respirator assures a good seal between filter and face piece. It further states that inhalation and exhalation resistance are low, making the 7100 a non-fatiguing respirator. The literature states that the user can wear the 7100 for hours without discomfort and describes the filter as non-clogging.

32. A written warranty sold by Norton with the respirator commencing in 1976 warrants the Model 7100V to be free of defects and describes the respirator as providing protection against dusts. It also describes the electrostatic filter as high quality and describes the face piece as providing the best possible fit.

33. These representations with respect to the Norton 7100 providing protection against asbestos, silica, pneumoconiosis-producing dusts and dusts of the size and concentrations stated were false and known to be false by Norton.

34. The Director of Research at Norton Company, W. H. Revoir, is the same Revoir who was the author of the studies of American Optical's electrostatic filters in 1951 and 1958 discussed above. Revoir was already aware of the deficiencies in these filters and the problems with leakage and degradation when he came to Welsh and later Norton. Also, on June 1, 1978, Norton conducted and circulated an internal study by Howle, Derby, Williams, Pracht and Chappron and forwarded the study to Revoir. Tables I-III attached to the study demonstrate that silica dust particles in substantial quantities and percentages (up to 12.96% of the fibers) penetrate the filter and are inhaled by workers.

35. A series of studies comparing the performance of respirators manufactured by various manufacturers was conducted at Los Alamos laboratories and concluded in 1973 and presented at the Annual American Industrial Hygiene Conference in May 1973 as an abstract. The study included the Welsh respirators and filters and was later forwarded to Norton and contained in the Norton files. The study concludes that the filters on these respirators degrade with temperature and humidity and summarizes the percentage of fibers that get through to be inhaled by the worker in Table 1.

36. Additional respirator studies for the National Institute of Occupational Safety from July 1, 1972 through June 3, 1973 and from July 1974 through June 30, 1975 involving the [illegible] the same William Revoir who worked for both Welsh and Norton establish that the Welsh (and later

Norton) respirators allow significant inhalation of fibers, that the filter's efficiency degrades with temperature and humidity and that the seal and fit is not protective. Results are summarized in Tables III, IV, VI, VIII, XI, XIII and XV of the 1972 study.

37. On October 18, 1983 W. H. Revoir, the former Welsh and Norton safety director, testified under oath that Norton knew that the respirators did not fully filter out these fibers, that the filters degraded with heat and temperature and that the filter leaked fibers. This testimony is lodged with the Court in *Gordon v. Schmidt*, No. 93-042852, Harris County, Texas, p. 170-175. Revoir also testified that for slightly more cost the respirators could have been made more safe (p. 178-180). He admits that silica would be inhaled by respirator users. (p. 195-197).

38. Norton production supervisor, Anthony Ricci, also testified that the Norton respirators allowed the penetration of fibers and that the filters leaked fibers. (Ricci deposition, *Gordon v. Schmidt*, p. 118-128.)

39. Norton made the above-described false representations with respect to its sales and marketing literature intending that the representations would be relied upon and knowing that they were, in fact, relied upon by its customers and users of the product.

40. Mine Safety Appliance made certain false statements and false representations in connection with the sale and distribution of its respirators. The following sets forth those false statements and misrepresentations:

41. A four-page sales and product brochure entitled the MSA Dustfoe 66 with replaceable electrostatic filter accompanied the sale and distribution of the MSA Dustfoe 66. On the first page it claims to provide protection against "fibrosis producing dusts." Fibrosis is a generic term for scarring and includes silicosis, which Worker Plaintiffs have contracted. Also, on the same page,

MSA claims the respirator filters out extremely small and/or toxic particles and is 99.98% effective.

42. On page two the brochure claims to protect against fibrosis producing dusts.

43. On page three it claims to provide an airtight seal cap. In another sales catalog document entitled "The Dustfoe Respirator", on page 35, Mine Safety Appliance says, the Dustfoe provides "complete protection against dust particles, including invisible dust particles so dangerous to health." On the same page it describes itself as "For Pneumoconiosis Dusts."

44. The packaging label describes the respirator as providing protection against the inhalation of pneumoconiosis producing dusts, specifically mentions silicosis and asbestosis and specifically lists silica and asbestos as the dusts for which protection is provided.

45. A 1957 brochure states that the Dustfoe 66 filter "effectively traps airborne harmful dusts" and a 1965 brochure claims its electrostatic filter provides maximum filter effectiveness. The 1957 brochure says the face piece provides a perfect seal and the 1965 brochure describes the seal as "airtight".

46. These representations were false and were known by Mine Safety Appliance to be false, as the following paragraphs describe:

47. A February 12, 1951 internal MSA document shows that there is 21.4 mg of silica leakage through the filter. The same document shows that there is 15-19 mg of silica leakage in another test. The same document shows that Mine Safety knew that moisture adversely affects the filter's effectiveness.

48. A March 14, 1952 internal Mine Safety Appliance document expresses concern about the deterioration of their filters due to humidity and fiber leakage.

49. An October 11, 1961 Mine Safety internal document shows that there is 44% average fiber penetration when the charge on the filter degrades.

50. A November 16, 1961 Mine Safety document shows that 40% of the fibers penetrate when the filter degrades.

51. A November 20, 1951 Mine Safety document shows that the valves stick and don't function properly.

52. An April 4, 1955 Mine Safety Appliance document establishes that the valves leak fibers.

53. A November 4, 1969 internal Mine Safety Appliance document shows leakage of 37 cc/min with the Dustfoe 66 respirator compared to 2 cc/min on its newer Dustfoe 77. It continued selling both models.

54. Three internal documents entitled Dusts and Fumes (1957), Dust and Fumes in Industry, and Pertinent Questions and Answers Concerning Dusts, published by Mine Safety, extensively chronicle the knowledge of Mine Safety Appliance of the risks of pneumoconiosis, silicosis and asbestosis and the importance of full respiratory protection.

55. Internal reports dated September 30, 1972, June 3, 1973 and March 31, 1973 acknowledge fiber leakage ranging from 5 - 38%.

56. Correspondence and a memorandum on January 16, 1973, March 2, 1973, March 6, 1973, February 7, 1974, March 15, 1974 and June 10, 1974 within the company and between the Company and the government (who was investigating the deficiencies) discuss the deficiencies of the Mine Safety Respirators with respect to leakage, poor fit, filter degradation and valve leakage.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## VI.

## SIXTH CAUSE OF ACTION

### (Wrongful Death)

57. Plaintiffs incorporate by reference as though fully set forth herein all of the allegations contained in Causes of Action I-V.

58. Paul Stewart died on November 12, 2001 from lung cancer. Each of the Defendants' acts and/or omissions, singularly or in combination with others, proximately and legally caused the fatal injuries and death which Paul Stewart suffered.

59. As a direct and proximate result of Paul Stewart's injuries and death, Plaintiffs Priscilla Stewart, Jeffery Dale Stewart, George O'Dell Stewart, John Lee Stewart, Rose Mary Piatt, Paula Dean Queen, Jimmy Eugene Stewart and James William Stewart, the surviving spouse and children of Paul Stewart, are entitled to recover the following wrongful death damages:

a. Physical pain, mental anguish and death

b. Medical expenses

c. Funeral expenses

d. Loss of consortium

e. Loss of household services

**VII.**

**PUNITIVE DAMAGES**

**(Causes of Action I-VI)**

60. Plaintiffs incorporate by reference as though fully set forth herein all of the allegations contained in Causes of Action I-VI.

61. In performing the acts described above and engaging in the conduct described above, Defendants acted maliciously, willfully, intentionally, recklessly and in wanton and willful disregard of Worker Plaintiffs' safety. Accordingly, Plaintiffs are entitled to punitive and exemplary damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants and Does 1- 100 on all causes of action as follows:

1. For general damages in an amount in excess of the jurisdictional limits of this Court according to proof.

2. For special damages including, but not limited to, medical bills, future medical bills and expenses, medical monitoring costs, wage loss and other economic loss according to proof.

3. For punitive and exemplary damages according to proof.

4. For damages for fraud and conspiracy according to proof.

5. For pre-judgment and post-judgment interest in accordance with law.

6. Costs of suit.

7. For such other and further relief as the court may deem just and proper.

Respectfully submitted,

**WILLIAMS ✦ BAILEY LAW FIRM, L.L.P.**

By: ______________________

JOHN R. FABRY
Texas State Bar No. 06768480
ROBERT E. SHUTTLESWORTH
Texas State Bar No. 24033184
8441 Gulf Freeway, Suite 600
Houston, Texas 77017
Telephone: 713-230-2200
Facsimile: 713-643-6226

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I certify that on this 28th day of May, 2002, a true and correct copy of the foregoing was served upon all known counsel of record.

______________________
ROBERT E. SHUTTLESWORTH